24CA2074 Peo in Interest of Walsh 02-06-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA2074
City and County of Broomfield District Court No. 24MH55
Honorable Mark D. Warner, Judge

---

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of Christine Walsh,

Respondent-Appellant.

---

ORDER AFFIRMED

Division VI
Opinion by JUDGE SCHUTZ
Welling and Kuhn, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 6, 2025

---

Nancy D. Rodgers, City & County Attorney, Courtney Thiemann, Senior
Assistant City & County Attorney, Broomfield, Colorado, for Petitioner-Appellee

Tezak Law, P.C., Mary Tezak, Florence, Colorado, for Respondent-Appellant

¶ 1    Christine Walsh appeals the district court's order authorizing (1) her certification for short-term mental health treatment and (2) the involuntarily administration of medication.  We affirm.

## I.    Background

¶ 2    In November 2024, passersby observed that Walsh had been standing in the same outdoor location for several hours.  One of them sought a welfare check, and local law enforcement responded.  Walsh indicated that she was waiting for her husband, Frank; in fact, she is not known to be married, but her outpatient psychiatrist is named Frank.  Concerned that Walsh was mentally unwell, the responders took her to the hospital emergency department where emergency room physicians surmised that she had developed a psychosis due to her "disengagement from outpatient mental healthcare and nonadherence to pharmacotherapy."  Walsh presented in a catatonic state — she was mute, rigid, and prone to staring.

¶ 3    Walsh was involuntarily admitted to AdventHealth Porter Hospital (Porter) for psychiatric care.  According to her treating psychiatrist, Dr. Shujah Choudhry, Walsh appeared to have developed "some system of psychosis" and has a "psychiatric

1

history notable for bipolar disorder (type 1)." When her treatment team attempted to explore her mental health condition and history with her and discuss treatment, Walsh was unwilling to engage on the topic, instead "claim[ing] to be a citizen of France, Ireland[,] and Saudi Arabia," and saying "that the government has retained sole [authority] over her medical decision making, hence why she is incapable of adhering to treatment within [the] hospital."

¶ 4 Pursuant to section 27-65-109, C.R.S. 2024, Dr. Choudhry certified Walsh for short-term mental health treatment. He also wanted authorization to involuntarily administer Walsh four medications — namely, haloperidol (Haldol); paliperidone (Invega); lorazepam (Ativan); and lithium. The City and County of Broomfield Attorney filed a motion seeking such an order.

¶ 5 After a hearing, the district court entered an order confirming the short-term certification for treatment and granting the involuntary administration of three of the four requested medications. The court found, by clear and convincing evidence, that the requirements for short-term certification had been established. Likewise, the court ordered the involuntary administration of Haldol, Invega, and lithium, but not Ativan.

## II. Legal Principles and Standard of Review

¶ 6    To authorize short-term certification for mental health treatment, a court must find that the patient has a mental health disorder and, as a result, is gravely disabled or a danger to herself or others. *People in Interest of Ramsey*, 2023 COA 95, ¶ 25; §§ 27-65-109(1)(a), 27-65-113(1), C.R.S. 2024.

¶ 7    A court may authorize the involuntary administration of medication to a patient if the petitioning party establishes each of the elements set forth in *People v. Medina*, 705 P.2d 961 (Colo. 1985): (1) the patient is incompetent to effectively participate in the treatment decision; (2) the treatment is necessary to prevent a significant and likely long-term deterioration in the person's mental health condition or to prevent the likelihood of the patient causing serious harm to herself or others in the institution; (3) a less intrusive treatment alternative is not available; and (4) the person's need for treatment is sufficiently compelling to override any bona fide and legitimate interest of the person in refusing treatment. *Id.* at 973.

¶ 8    Both an order of short-term certification and an order authorizing the involuntary administration of medications must be

supported by clear and convincing evidence. *Ramsey*, ¶ 39; *Medina*, 705 P.2d at 971. Clear and convincing evidence is "evidence that is highly probable and free from serious or substantial doubt." *Destination Maternity v. Burren*, 2020 CO 41, ¶ 10 (citation omitted).

¶ 9 In performing our review, we determine whether the evidence, viewed as a whole and in the light most favorable to the petitioning party, is sufficient to support the court's order. *People in Interest of R.K.L.*, 2016 COA 84, ¶ 13. We defer to the court's factual findings if there is evidence supporting them, but we review the court's legal conclusions de novo. *People in Interest of Strodtman*, 293 P.3d 123, 131 (Colo. App. 2011).

¶ 10 Discussion

¶ 11 As to the short-term certification order, Walsh asserts that insufficient evidence supports a conclusion that she is either gravely disabled or a danger to herself or others. And as to the involuntary administration of medications, she does not contest the third and fourth *Medina* elements but asserts that insufficient evidence supports the first and second. We discern no error.

## A. Gravely Disabled

¶ 12 "Gravely disabled" means that, due to a mental health disorder, a person is incapable of making informed decisions about or providing for her essential needs without significant supervision and assistance from other people. § 27-65-102(17), C.R.S. 2024. As a result, such a person "is at risk of substantial bodily harm, dangerous worsening of any concomitant serious physical illness, significant psychiatric deterioration, or mismanagement of the person's essential needs that could result in substantial bodily harm." *Id.*

¶ 13 A person is "gravely disabled" if she is "unable to take care of basic personal needs." *People v. Taylor*, 618 P.2d 1127, 1134 (Colo. 1980). Basic personal needs means "those fundamental necessities of human existence, such as food, shelter, clothing, and medical care, which an individual must obtain and maintain in order to live safely." *Id.*

¶ 14 At the hearing, Dr. Choudhry offered his expert opinion that Walsh is gravely disabled as a result of her mental illness. He noted that, while in the emergency department, Walsh was catatonic, mute, rigid, and prone to staring, and was either unable or

unwilling to communicate with treatment providers, instead indicating that her information was "confidential." She "demonstrated an inability to care for herself" and "had an episode of urinary incontinence where she wet herself" and "was physically incapable" of "ventur[ing] to a bathroom" or "clean[ing] up after her[self]." Similarly, Dr. Choudhry testified, "during her hospitalization at Porter, as well as during her time in the emergency room, she demonstrated an inability" to adequately nourish or hydrate herself, which can lead to physical instability and enhanced heart rate and blood pressure. And when Walsh's treatment team attempted to discuss her condition with her, she claimed to be a citizen of other countries, which controlled her medical decision-making, and refused to provide her mental health and related medical history

¶ 15    This testimony supports the district court's finding that Walsh is gravely disabled.

¶ 16    Nonetheless, Walsh asserts, Dr. Choudhry testified that (1) he had not observed any other behaviors that demonstrated she was unable to care for herself and (2) "she has been caring for herself to a larger degree th[a]n she had in the [emergency department]." But

6

the definition of "gravely disabled" does not require any threshold number of behaviors indicative of an inability to care for oneself. Nor do incremental improvements in one's abilities to do so mean that a person is not gravely disabled. Rather, a finding that a person is gravely disabled requires only that a person is "unable to take care of basic personal needs." *Id.* And Dr. Choudhry testified that, during Walsh's (at the time) six-day hospitalization, "her nutrition and her hydration [were at times] sparse to a point where [he would] ask staff to try and log and keep records as to how much nourishment she [wa]s getting" and monitor her vital signs. However, Walsh "refused to allow staff to get those tests for reasons that she [would] not elaborate on." Likewise, she refused to provide her mental health history[1] or permit the treatment team to communicate with her outpatient provider and loved ones to assist in coordinating her care.

---

[1] In her reply brief, Walsh argues that the refusal to provide her mental health history is of no consequence because she did not have the burden to prove she was gravely disabled. This observation misses the mark. Walsh's failure to provide this information is relevant because it interfered with the ability of her providers to fully address her existing conditions, including her inability to take care of her basic human needs.

¶ 17    Under these circumstances, and notwithstanding the district court's observation that "the evidence was somewhat equivocal with respect to" grave disability, we cannot conclude that the evidence was insufficient to support the court's finding that Walsh is gravely disabled.  And because the statute requires a showing of grave disability *or* dangerousness, § 27-65-109(1)(a), we need not reach the issue of Walsh's dangerousness to herself or others.  *See Lombard v. Colo. Outdoor Educ. Ctr., Inc.*, 187 P.3d 565, 571 (Colo. 2008) ("Generally, we presume the disjunctive use of the word 'or' marks distinctive categories.").

### B.    The First *Medina* Element: Incompetency to Participate in Treatment Decision

¶ 18    To lawfully administer medication on an involuntary basis, the petitioner must show "the patient's incompetency to make treatment decisions."  *Medina*, 705 P.2d at 973.  A court may not order the forced medication of an involuntarily committed patient unless it is satisfied that the patient's mental illness has so impaired her judgment as to render her "incapable of participating in decisions affecting [her] health."  *Id.* (citation omitted).

¶ 19     At the hearing, the district court did not make an express determination that Walsh was incompetent to effectively participate in the treatment decisions. Instead, after indicating that it was turning to the subject of forced administration of medications, the court stated that it was required to find that Walsh was "incapable of making informed decisions about providing for that person's essential needs without significant supervision and assistance from other people." Although it bears on the question of Walsh's ability to participate in decisions affecting her treatment, this is not, strictly speaking, the test for a finding of incompetency under *Medina*. Rather, the court's articulation of the legal standard more accurately tracks the inquiry into whether the patient is gravely disabled such that short-term certification is warranted.

¶ 20     Nonetheless, the court's written order appropriately articulates — and the evidence is sufficient to establish — the first *Medina* element. True, Walsh testified that she is "competent to effectively participate in the decisions regarding medications" because she "know[s] [her] own body, [her] own strength, and [her] own mind." But she also testified that (1) she shares a "medical power of attorney" with three lawyers; (2) she has physicians in Ireland

whose treatment "supersede[s]" the care she might receive in the United States; and (3) all of her health information is "protected and confidential" because she is a "confidential citizen."

¶ 21 Dr. Choudhry testified that, when he has attempted to discuss Walsh's mental health condition and the importance of treatment with her, she is "unwilling to explore [the topics]" with her treatment team, is "mute and refuses to converse," "segue[s] the conversation away" from discussion of her mental health, and says that such information is "confidential" or that she is a "protected individual" and thus "cannot disclose" information. And as noted, when Dr. Choudhry has further attempted to engage her, "she claims to be a citizen of France, Ireland and Saudi Arabia, and tells [him] that the government has retained sole [authority] over her medical decision making, hence why she is incapable of adhering to treatment within [the] hospital." Moreover, Walsh denies having ever been diagnosed with a mental illness or previously hospitalized for mental health treatment, which her medical records refute. Thus, in Dr. Choudhry's opinion, her refusal of treatment and treatment discussions is not "reality based" and is "wholly illogical."

¶ 22 Notwithstanding conflicts in the evidence, this record is sufficient to show that Walsh lacks insight into her mental health condition, does not or cannot acknowledge its severity, and equivocates on her own authorization to make decisions regarding her care. Thus, we conclude the record evidence satisfies the first *Medina* element.

### C. The Second *Medina* Element: Deterioration

¶ 23 The district court also concluded that the second *Medina* element was satisfied — namely, that the requested medications are necessary to prevent a significant and likely long-term deterioration in Walsh's mental health. The record supports this conclusion. Dr. Choudhry specifically testified that if Walsh was left untreated and unmedicated, she would be at risk of significant psychiatric deterioration. In addition, he noted that "the longer her symptoms go untreated, the less responsive they may be to intervention."

### III. Disposition

¶ 24 The order is affirmed.

JUDGE WELLING and JUDGE KUHN concur.